**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AUGUSTA MILLENDER; BRENDA
MILLENDER; and WILLIAM JOHNSON,
　　　　　*Plaintiffs-Appellees,*

　　　　　　　　v.

COUNTY OF LOS ANGELES; ROBERT
J. LAWRENCE (292848); CURT
MESSERSCHMIDT (283271),
　　　　　*Defendants-Appellants,*

　　　　　　　　and

LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT; LEROY D. BACA;
SCOTT WALKER (188188); RICK
RECTOR (280600); DONALD
NICHIPORUK (213625); RICHARD
SCHLEGEL (280735), e/s/a M.
SCHLEGEL; BRICE STELLA (402018),
e/s/a D. STELLA; JACK DEMELLO
(223333), e/s/a J. DERNELLO;
DAVID O'SULLIVAN (293952); JACK
RITENOUR (164927); and IAN STADE
(279464),
　　　　　　　　*Defendants.*

No. 07-55518

D.C. No.
CV-05-02298-DDP

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
December 14, 2009—San Francisco, California

Filed August 24, 2010

12709

Before: Alex Kozinski, Chief Judge, Pamela Ann Rymer, Barry G. Silverman, Susan P. Graber, Raymond C. Fisher, Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee, Consuelo M. Callahan, Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Callahan;
Dissent by Judge Silverman

_____

### COUNSEL

Eugene P. Ramirez, Esq., Manning & Marder, Kass, Ellrod, Ramirez LLP, Los Angeles, California, attorney for the appellants.

Robert Mann, Esq., Mann & Cook, Los Angeles, California, attorney for the appellees.

_____

### OPINION

IKUTA, Circuit Judge:

Plaintiffs Augusta Millender, Brenda Millender, and William Johnson (collectively, "the Millenders") filed this suit under 42 U.S.C. § 1983 against the County of Los Angeles, the Los Angeles County Sheriff's Department, and several individual members of the Sheriff's Department, alleging violations of their civil rights. Their complaint arose from a search pursuant to a warrant obtained by Detective Curt Messerschmidt of the Los Angeles County Sheriff's Department and executed under the supervision of Sergeant Robert Lawrence. Messerschmidt and Lawrence (collectively, "the

deputies") appeal from the district court's determination that they were not entitled to qualified immunity with respect to the alleged overbreadth of the search warrant. Because the challenged sections of the warrant were "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," *Malley v. Briggs*, 475 U.S. 335, 345 (1986), we affirm.

# I

On November 4, 2003, Messerschmidt applied for an arrest warrant for Jerry Ray Bowen at 2234 E. 120th St., Los Angeles, and for a warrant to search that address and seize specified property in connection with "a spousal assault and an assault with a deadly weapon." Messerschmidt prepared an affidavit, entitled "Statement of Probable Cause." The affidavit contained the following facts: The victim of the assault, Shelly Kelly, stated that she had a "dating relationship" with the suspect, Bowen. Kelly decided to end the relationship due to Bowen's violent temper and because Bowen had previously physically assaulted her. Because of Bowen's violent nature, Kelly asked the Sheriff's Department to send officers to protect her while she gathered some of her property from the residence that she and Bowen shared. Once the requested officers arrived, Kelly began to move her property to her car. After approximately twenty minutes, the officers received an emergency call and had to leave, saying they would return after they handled the call.

According to Kelly, as soon as the officers left, Bowen appeared and screamed, "I told you to never call the cops on me bitch!" Bowen physically assaulted Kelly and attempted to throw her over the top railing of the second story landing of their residence. Bowen grabbed Kelly, bit her, and tried to drag her by the hair back into their residence. When Kelly resisted by bracing herself against the door, Bowen grabbed both of Kelly's arms, but Kelly was able to slip out of her shirt and run to her car. Bowen followed seconds later, now

holding "a black sawed off shotgun with a pistol grip." Standing in front of Kelly's car, Bowen pointed the shotgun at Kelly and shouted, "If you try to leave, I'll kill you bitch." Kelly was able to escape by leaning over in her seat and flooring the gas. Bowen jumped out of the way and fired one shot at her, blowing out the front left tire of Kelly's car. Chasing the car on foot, Bowen fired four more times in Kelly's direction, missing her each time.

Shortly after, Kelly located police officers who immediately recognized her as the same person they had been protecting before they left for the emergency call. Kelly reported the shooting, described Bowen's firearm as a "black sawed off shotgun with a pistol grip," and gave the officers four photos of Bowen to aid their investigation.

Based on this information, Messerschmidt put a photo of Bowen into a "six pack" line-up. When Messerschmidt showed the photo line-up to Kelly, she immediately identified Bowen and circled his picture. Messerschmidt's affidavit states that "[t]he person [Kelly] identified is Jerry Ray Bowen . . ., a known Mona Park Crip gang member." Kelly told Messerschmidt that Bowen's current address was 2234 E. 120th St., Los Angeles.

Messerschmidt requested a "Ramey Warrant" to arrest Bowen, because Kelly knew him personally and identified him as the person who physically assaulted and shot at her.[1] According to the affidavit, Messerschmidt conducted an "extensive background search" on Bowen using "departmental records, state computer records, and other police agency records." Using these records and information provided by Kelly, Messerschmidt confirmed that Bowen resided at 2234 E. 120th St. in Los Angeles.

---

[1] A "Ramey warrant" is a warrant authorizing the arrest of a suspect within the home before the filing of criminal charges by the district attorney. *Goodwin v. Superior Court*, 108 Cal. Rptr. 2d 553, 555 (Ct. App. 2001) (citing *People v. Ramey*, 545 P.2d 1333 (Cal. 1976)).

Messerschmidt's affidavit also requested night service of the search warrant, giving two reasons. First, "the investigation has shown that the primary suspect in this case has gang ties to the Mona Park Crip gang based on information provided by the victim and the cal-gang data base." Second, Messerschmidt believed that "the nature of the crime (Assault with a deadly weapon) goes to show that night service would provide an added element of safety to the community" as well as to those personnel serving the warrant. The affidavit concluded by stating that Messerschmidt "believes that the items sought will be in the possession of Jerry Ray Bowen and the recovery of the weapon could be invaluable in the successful prosecution of the suspect involved in this case, and the curtailment of further crimes being committed."

In addition to preparing the affidavit, Messerschmidt completed a "Search Warrant and Affidavit" form to authorize the search of the residence identified in "Attachment 1" and the seizure of property identified in "Attachment 2." Attachment 1 identifies the "location to be searched" as 2234 E. 120th St. in Los Angeles. Attachment 2 sets out two categories of items to search and seize. The first paragraph lists:

> All handguns, rifles, or shotguns of any caliber, or any firearms capable of firing ammunition, or firearms or devices modified or designed to allow it to fire ammunition. All caliber of ammunition, miscellaneous gun parts, gun cleaning kits, holsters which could hold or have held any caliber handgun being sought. Any receipts or paperwork, showing the purchase, ownership, or possession of the handguns being sought. Any firearm for which there is no proof of ownership. Any firearm capable of firing or chambered to fire any caliber ammunition.

The second paragraph lists:

> Articles of evidence showing street gang membership or affiliation with any Street Gang to include

but not limited to any reference to "Mona Park Crips", including writings or graffiti depicting gang membership, activity or identity. Articles of personal property tending to establish the identity of person [sic] in control of the premise or premises. Any photographs or photograph albums depicting persons, vehicles, weapons or locations, which may appear relevant to gang membership, or which may depict the item being sought and or believed to be evidence in the case being investigated on this warrant, or which may depict evidence of criminal activity. Additionally to include any gang indicia that would establish the persons being sought in this warrant, affiliation or membership with the "Mona Park Crips" street gang.

An additional attached affidavit recounts Messerschmidt's experience in gang investigations. The Search Warrant includes Messerschmidt's attestation that the incorporated affidavit is true and the property described in Attachment 2 is lawfully seizable.

Messerschmidt also drafted a "Probable Cause Arrest Warrant and Affidavit in Support Thereof" to authorize the arrest of Bowen, which again states his address as 2234 E. 120th St., Los Angeles. This arrest warrant application incorporates Messerschmidt's affidavit by reference.

Messerschmidt was aware of other relevant facts not included in the affidavit. First, Kelly explained to Messerschmidt that the address she gave him, 2234 E. 120th St., was the home of Bowen's foster mother, Augusta Millender. Second, Messerschmidt knew that Bowen had a previous criminal record and was on summary probation for spousal battery and driving without a license.[2] Bowen also had several previous

---

[2]Kelly also informed Messerschmidt of Bowen's domestic violence record during their interview.

felony convictions and misdemeanor arrests, and was a "third strike candidate" under California law.[3] Third, in addition to identifying the gun Bowen used as a black sawed-off shotgun with a pistol grip, Kelly gave Messerschmidt a picture of Bowen posing with the gun. Fourth, there was no evidence that Bowen's assault on Kelly was in any way gang-related. In subsequent testimony, Messerschmidt answered "No" to the question, "So you didn't have any reason to believe that the assault on Kelly was any sort of a gang crime, did you?"

Before Messerschmidt submitted the warrants and affidavit to the magistrate, they were reviewed by his supervisors in the Sheriff's station, Sergeant Lawrence and Lieutenant Ornales. In addition, Deputy District Attorney Janet Wilson signed the search warrant, indicating that she had reviewed it for probable cause and approved it. Messerschmidt presented the Search Warrant and Affidavit and the Probable Cause Arrest Warrant, along with their attachments (including the affidavit), to a magistrate. The magistrate approved both warrants and authorized night service.

At 5:00 a.m. on the morning of November 6, 2003, the Sheriff's Department's SWAT team served the search and arrest warrants at the 120th St. address. The SWAT team forced open the front security door, broke a front window, and proceeded to enter, search, and clear the house. The ten occupants of the house, including the Millenders, were ordered to exit, which they did. Once the SWAT team had secured the residence, investigators searched the area. While Messerschmidt and Lawrence did not participate in the search, they were both present. The investigators conducting the search failed to find Bowen or a black sawed-off shotgun with a pistol grip. However, they did find and take Augusta Millender's personal shotgun (a black 12-gauge "Mossberg" with a wooden stock), a box of .45 caliber "American Eagle" ammunition, and a letter from Social Services addressed to Bowen. Some

---

[3]*See generally Ewing v. California*, 538 U.S. 11, 14-17 (2003).

two weeks later, Messerschmidt, without SWAT assistance, arrested Bowen in the middle of the day after discovering Bowen hiding under a bed in a motel room.

The Millenders filed suit under 42 U.S.C. § 1983 against the County of Los Angeles, the Los Angeles County Sheriff's Department, Sheriff Leroy Baca, and 27 Los Angeles County deputies, including Messerschmidt and Lawrence. As relevant here, the Millenders alleged violations of their Fourth and Fourteenth Amendment rights. The parties filed cross motions for summary adjudication on the validity of the arrest and search warrants. The district court concluded that the arrest warrant was facially valid, and granted the defendants' motion for summary adjudication on this issue. The Millenders have not appealed this ruling.

The district court also held that the warrant's authorization to search for and seize all firearms, firearm-related materials, and gang-related items was unconstitutionally overbroad, but that its authorization to search for evidence tending to establish control of the premises was constitutional. Accordingly, the court granted the Millenders' motion for summary adjudication as to firearm- and gang-related evidence, but granted the defendants' motion as to identification evidence. The district court then rejected the deputies' claim of qualified immunity on the ground that the deputies' actions were not objectively reasonable.

Messerschmidt and Lawrence timely appealed the district court's determination that they were not entitled to qualified immunity.

## II

Although we normally lack jurisdiction to consider the denial of a motion for summary judgment, we may consider an appeal from such an interlocutory motion where the motion is based on a claim of qualified immunity, *KRL v.*

*Estate of Moore*, 512 F.3d 1184, 1188 (9th Cir. 2008), even when other claims against the defendants are pending below, *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996). "Our jurisdiction . . . , however, is limited to questions of law; it does *not* extend to claims in which the determination of qualified immunity depends upon disputed issues of material fact." *Schwenk v. Hartford*, 204 F.3d 1187, 1195 (9th Cir. 2000). When facts are disputed, "we assume the version of the material facts asserted by the non-moving party to be correct." *Id.*; *see also Groh v. Ramirez*, 540 U.S. 551, 562 (2004). We review the district court's legal determinations de novo. *Elder v. Holloway*, 510 U.S. 510, 516 (1994); *KRL*, 512 F.3d at 1188.

## III

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (internal quotation marks omitted). A police officer is not entitled to qualified immunity if: (1) the facts show that the officer's conduct violated a plaintiff's constitutional rights; and (2) those rights were clearly established at the time of the alleged violation. *See id.* at 816. Although we have discretion to address these prongs in any order, *see id.* at 818, we begin in this case by considering whether the deputies' conduct violated the Millenders' constitutional rights, *see id.* at 816.

## A

**[1]** The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, sup-

ported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Supreme Court has recognized that a search or seizure pursuant to an invalid warrant constitutes an invasion of the constitutional rights of the subject of that search "at the time of [the] unreasonable governmental intrusion." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990); *see also United States v. Leon*, 468 U.S. 897, 906 (1984) ("The wrong condemned by the [Fourth] Amendment is 'fully accomplished' by the unlawful search or seizure itself . . . ."). Even when only a portion of a search warrant is invalid, the subject of the search suffers a constitutional violation. *See United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005); *United States v. Spilotro*, 800 F.2d 959, 967-68 (9th Cir. 1986) (Kennedy, J.). A search warrant that is not issued "upon probable cause" is invalid. U.S. Const. amend. IV; *Groh*, 540 U.S. at 557. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). To be valid, a search warrant must also "particularly describ[e]" the "things to be seized." U.S. Const. amend. IV; *see Groh*, 540 U.S. at 557.

**[2]** We read the Fourth Amendment as requiring "specificity," which has two aspects, "particularity and breadth." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991)). In determining whether a warrant's description is sufficiently specific to meet these Fourth Amendment requirements, we consider the following questions:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Spilotro*, 800 F.2d at 963 (citations omitted). The first consideration encapsulates the overarching Fourth Amendment principle that police must have probable cause to search for and seize "all the items of a particular type described in the warrant." *In re Grand Jury Subpoenas*, 926 F.2d at 857; *see also SDI Future Health*, 568 F.3d at 702-03; *VonderAhe v. Howland*, 508 F.2d 364, 369-70 (9th Cir. 1974). The second and third factors are relevant to determining whether the warrant satisfies this general rule.

When considering challenges to warrants under this framework, we must be mindful that a "magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). The Supreme Court has directed us to take a practical approach in determining whether there is sufficient probable cause, and to avoid "interpreting affidavits in a hypertechnical, rather than a common-sense, manner." *Id.* (brackets and internal quotation marks omitted). "Deference to the magistrate, however, is not boundless." *Leon*, 468 U.S. at 914. We are not to "defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 915 (citation and internal quotation marks omitted).

B

We begin by analyzing whether the warrant's authorization to search for firearms and firearm-related materials satisfies

the three-factor specificity framework. We first consider whether the deputies had probable cause to search for and seize "all the items of a particular type described in the warrant." *In re Grand Jury Subpoenas*, 926 F.2d at 857. "The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (plurality opinion). For example, probable cause to search for documents pertaining to "certain aspects of [an] operation" cannot justify the seizure of all documents in an office. *United States v. Stubbs*, 873 F.2d 210, 211 (9th Cir. 1989).

**[3]** As noted above, the warrant in this case authorizes a search for essentially any device that could fire ammunition, any ammunition, and any firearm-related materials. There is no dispute that the deputies had probable cause to search for and seize the "black sawed off shotgun with a pistol grip" used in the crime. But the affidavit does not set forth any evidence indicating that Bowen owned or used other firearms, that such firearms were contraband or evidence of a crime, or that such firearms were likely to be present at the Millenders' residence. Nothing in the warrant or the affidavit provides any basis for concluding there was probable cause to search for or seize the generic class of firearms and firearm-related materials listed in the search warrant. As such, we conclude that "probable cause did not exist to seize all items of those particular types." *SDI Future Health*, 568 F.3d at 705 (brackets and internal quotation marks omitted).

**[4]** The rule that police must have probable cause for every item searched does not always invalidate warrants that authorize a search for classes of generic items. *See Spilotro*, 800 F.2d at 963. As the framework's second consideration suggests, a broader search warrant may sometimes be valid if the warrant establishes standards that are sufficiently specific to "reasonably guide the officers in avoiding seizure of protected property" and to allow judicial review "to determine whether

the instructions were followed and legitimate property and privacy interests were protected." *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982); *see also United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984). Nevertheless, a warrant based on an affidavit describing "a few stolen diamonds" could not validly authorize a search for a broad category of "gemstones and other items of jewelry" because such a warrant would "provide[ ] no basis for distinguishing [the stolen] diamonds from others the government could expect to find on the premises." *Spilotro*, 800 F.2d at 965.

**[5]** More specific standards may be contained in an affidavit, rather than the warrant itself, only if: "(1) the warrant expressly incorporate[s] the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search." *United States v. Kow*, 58 F.3d 423, 429 n.3 (9th Cir. 1995). Applying this principle, we upheld a warrant authorizing police officers to "search all motor vehicles and heavy equipment found on the premises" to determine which were stolen in part because the warrant incorporated an affidavit that established "procedures to differentiate stolen vehicles from those legally owned." *Hillyard*, 677 F.2d at 1339, 1341; *see also United States v. Adjani*, 452 F.3d 1140, 1148-49 (9th Cir. 2006).

**[6]** In this case, the deputies argue that the affidavit narrowed the scope of the search warrant by including specific information about the crime at issue, the weapon used, and Bowen's gang membership, and that this information cured any constitutional deficiency. The affidavit does satisfy the first prong of the *Kow* test: the district court found that the warrant expressly incorporated the affidavit by reference. But there is no evidence in the record, nor do the deputies argue, that the affidavit was physically attached to the warrant or accompanied the warrant on the search. Therefore, we cannot consider its effect. *See United States v. Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003); *see also Groh*, 540 U.S. at 557

("The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents."); *Spilotro*, 800 F.2d at 967; *Hillyard*, 677 F.2d at 1340.

**[7]** Even if we could consider the affidavit, it still would not cure the warrant's deficiencies. Messerschmidt did not use the affidavit at the Millenders' residence to provide more specific direction to the investigators who searched the house, for instance by alerting the investigators as to what type of firearm (within the generic class of firearms described in the warrant) was used in the crime. Nor did the investigators executing the warrant understand the affidavit to narrow the scope of the search. Rather, they seized Augusta Millender's shotgun, which did not resemble the firearm described by Kelly: it had a wooden stock and was neither sawed-off nor had a pistol grip. As in *Kow*, where we held that an incorporated affidavit did not cure a facially invalid warrant, "there is absolutely no evidence in this case that the officers who executed the warrant, although instructed to read the affidavit, actually relied on the information in the affidavit to limit the warrant's overbreadth." 58 F.3d at 429. Accordingly, we cannot uphold the warrant based on objective standards in the affidavit.

**[8]** Finally, as suggested by the framework's third consideration, warrants may sometimes authorize a search for classes of generic items if the government was not "able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Spilotro*, 800 F.2d at 963; *see also Adjani*, 452 F.3d at 1147-48. For example, in *United States v. Storage Spaces Designated Nos. "8" and "49" Located at 277 East Douglas*, we upheld a warrant authorizing search and seizure of a broad class of potentially misbranded drugs in part because the government did not have information allowing it to describe the drugs more specifically. 777 F.2d 1363, 1370 (9th Cir. 1985). But where the police do have information more specifically describing the evidence or contraband, a warrant authorizing

search and seizure of a broader class of items may be invalid. Thus, when "[u]pon the information available to it, the government knew exactly what it needed and wanted," it was unconstitutional for a warrant to authorize "a massive re-examination of all records." *VonderAhe*, 508 F.2d at 370; *see also SDI Future Health*, 568 F.3d at 704-05 (a portion of a search warrant authorizing the search for "Documents relating to non-privileged internal memoranda and E-mail" held invalid when the government's interest was limited to communications related to sleep studies); *Ctr. Art Galleries-Haw., Inc. v. United States*, 875 F.2d 747, 750 (9th Cir. 1989) (where "the government had the means to identify accounts which may have involved [allegedly fraudulent Salvador] Dali artwork," a warrant authorizing agents to seize accounts of other artists was invalid), *superseded by statute on other grounds as stated in J.B. Manning Corp. v. United States*, 86 F.3d 926, 927 (9th Cir. 1996).

**[9]** In this case, the deputies had a precise description of the firearm used by Bowen in connection with his assault. Kelly, the eyewitness and victim of the assault, described the firearm as a "black sawed off shotgun with a pistol grip" and even provided the deputies with a photo of Bowen posing with the gun. Because the government knew " 'exactly what it needed and wanted,' " this third consideration also cuts against the validity of the warrant. *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982) (quoting *VonderAhe*, 508 F.2d at 370); *see Spilotro*, 800 F.2d at 963.

The deputies argue that the broad scope of the warrant was necessary in light of the specific circumstances of the crime. They note that a sawed-off shotgun can be broken down into separate pieces for easier concealment and that the deputies had probable cause to believe that a search for the disassembled parts of the sawed-off shotgun would be necessary. But this reasoning does not preclude a more precise description of the items subject to seizure. Under the specific circumstances of the crime, the deputies' probable cause extended only to

firearm components that could be part of a disassembled sawed-off shotgun with a pistol grip; there was no probable cause to search for disassembled pieces of all firearms described in the warrant. *See Spilotro*, 800 F.2d at 965.

The deputies also argue that it was necessary to draft the firearm description broadly because Kelly could have been mistaken in her description of the gun. This argument has little force in this situation, because Kelly provided the officers with a picture of the weapon. The warrant did not omit details that Kelly might have mistaken or that might not have been accurately reflected in the photo, such as the color or specific make of the weapon. Rather, Messerschmidt failed to include any limitation that would have helped focus the warrant on the specific type of gun legitimately subject to the search. Thus, the deputies' argument, if availing, would impermissibly allow police to "enlarge a specific authorization, furnished by a warrant . . . into the equivalent of a general warrant to rummage and seize at will." *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (internal quotation marks omitted).

**[10]** In short, the deputies had probable cause to search for a single, identified weapon, whether assembled or disassembled. They had no probable cause to search for the broad class of firearms and firearm-related materials described in the warrant. Although we have upheld warrants describing broad classes of items in certain cases, *see Storage Spaces,* 777 F.2d at 1370; *Hillyard*, 677 F.2d at 1340, the rationales adopted in those cases are inapplicable here given the information the deputies possessed.

The deputies raise several additional arguments to justify the breadth of the warrant. These arguments, however, are unrelated to the constitutional requirement that a search warrant not issue except upon probable cause for every item described in the warrant. *See In re Grand Jury Subpoenas*, 926 F.2d at 857.

First, the deputies argue that it was reasonable for the warrant to authorize a broad search for firearms and firearm-related materials because Bowen is a violent and dangerous person. The deputies draw attention to facts in the affidavit showing that Bowen was suspected of assault with a deadly weapon, was a gang member, and that night service was requested to protect the public. The deputies also rely on research not set forth in the affidavit which indicated that Bowen had a history of violence and several prior felony convictions. The dissent makes similar arguments, *see* Dissent at 12742-44, n.1 & n.6, and also contends that probable cause existed because firearms are inherently dangerous, Dissent at 12743-44.[4]

There is no doubt that deputies have a valid interest in protecting themselves and the public from potentially violent and dangerous suspects. Indeed, the Supreme Court has recognized that courts must give "some latitude" to "officers in the dangerous and difficult process of making arrests and executing search warrants," *Maryland v. Garrison*, 480 U.S. 79, 87 (1987). In this vein, the Court's "search incident to arrest" doctrine allows a police officer to take into account the inherent hazards raised by an arrestee's potential access to firearms, *see Chimel v. California*, 395 U.S. 752, 762-63 (1969). But there is no "dangerousness" exception to the Fourth Amendment's probable cause requirement, regardless of whether a search involves violent suspects or deadly weapons. A police officer's valid safety concerns do not create a "fair probability" that a broad class of weapons may be found in a suspect's residence or that such items are contraband or evidence of a crime. *See Grubbs*, 547 U.S. at 95. The deputies cite no case, and we have found none, holding that a warrant's overbreadth could be cured simply because of potential danger to police officers at some point in the future. Indeed, such a rule would permit officers to transform every warrant into

---

[4]We refer to Judge Callahan's dissent as "the dissent" or "Dissent." We refer to Judge Silverman's dissent by name.

a "general, exploratory search[ ]" allowing "indiscriminate rummaging through a person's belongings." *Spilotro*, 800 F.2d at 963; *see also Groh*, 540 U.S. at 561; *Coolidge*, 403 U.S. at 467 (plurality opinion). Nor is there a per se rule that police have probable cause to search the residences of ex-felons for firearms and firearm-related items. *See United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) (holding that a prior criminal history, without more, is insufficient to establish reasonable suspicion); *United States v. Herron*, 215 F.3d 812, 814 (8th Cir. 2000) (holding that evidence of prior marijuana convictions is insufficient to create probable cause to search the defendant's residence).[5]

Here the record is devoid of evidence that Bowen possessed guns other than the sawed-off shotgun identified by Kelly or that the broad range of firearms covered by the warrant would be present in the Millenders' residence. Therefore, regardless of Bowen's history or the inherent dangerousness of firearms, the police lacked probable cause to apply for a search warrant for a broad range of firearms.[6]

---

[5]We do not reach the question whether the deputies could justify the seizure of Augusta Millender's gun under the plain view doctrine, on the theory that a firearm, if owned by Bowen, could be evidence of a "felon in possession" crime. *See* 18 U.S.C. § 922(g)(1); Cal. Penal Code § 12021(a)(1). This argument was not raised below, and is not a pure question of law. *Cf. Scott v. Ross*, 140 F.3d 1275, 1283 (9th Cir. 1998) (holding that we have discretion to review issues not raised below when "the issue presented is purely one of law" and does not require additional factual development (internal quotation marks omitted)). Rather, in order to raise such an argument, the deputies would need to present evidence on critical factual issues such as whether the deputies saw Augusta Millender's gun "from a place and in circumstances where the viewing officer was entitled to be present," *Spilotro*, 800 F.2d at 968, and whether it would be immediately apparent to them that a firearm was contraband or evidence of a crime when Bowen did not have sole dominion or control over the 120th St. address, *see Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Ruiz*, 462 F.3d 1082, 1089 (9th Cir. 2006) ("[A]ccess to the premises does not equate to possession.").

[6]The dissent raises the further theory that the deputies had probable cause to obtain the search warrant for the Millenders' residence because

In any event, because Messerschmidt did not inform the magistrate of Bowen's prior felonies, his criminal history is not relevant to our analysis here. It is well established that, in reviewing a search warrant, we are "limited to the information and circumstances contained within the four corners of the underlying affidavit." *Crowe v. County of San Diego*, 593 F.3d 841, 869 (9th Cir. 2010) (internal quotation marks omitted); *see also United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc). Probable cause is a determination made by the issuing magistrate based on the facts presented to him, not a determination made by an officer based on information known only to himself. *See Gates*, 462 U.S. at 238-39. Therefore, the dissent errs in suggesting that Messerschmidt's personal knowledge that Bowen was a felon is sufficient to create probable cause. Dissent at 12743 & n.1.[7]

Second, the deputies argue they were justified in seeking all firearms and firearm-related materials because such materials

---

they had probable cause to obtain an arrest warrant for Bowen. *See* Dissent at 12743, 12757-58. But these are distinct tests: an arrest warrant must be based on probable cause that "an offense has been or is being committed," *Brinegar v. United States*, 338 U.S. 160, 176 (1949), while a search warrant can issue only on "a fair probability that contraband or evidence of a crime will be found in a particular place," *Grubbs*, 547 U.S. at 95 (internal quotation marks omitted). While a suspect's violent propensities may create probable cause for an arrest, there is no per se rule that such propensities authorize a general search for a broad range of weapons.

[7]Nor, contrary to the dissent, could the magistrate properly infer that Bowen had prior felony convictions from the affidavit's reference to information about Bowen in "the cal-gang data base." Dissent at 12743 n.1. According to CALGANG's Advisory Committee, a name may be added to the database based on nothing more than information that a "[s]ubject has been seen frequenting gang areas" and "has been seen affiliating with documented gang members." Cal. Gang Node Advisory Comm., Policy and Procedures for the CALGANG® System 7 (Sept. 27, 2007), *available at* http://ag.ca.gov/calgang/pdfs/policy_procedure.pdf. Indeed, the Advisory Committee warns that the CALGANG database "is not designed to provide users with information upon which official actions may be taken," and "cannot be used to provide probable cause for an arrest or be documented in an affidavit for a search warrant." *Id.* at 6.

could aid in the prosecution of Bowen. Again, this argument is unrelated to the constitutional requirement that there be probable cause for each item described in the warrant. Although the deputies likely had probable cause to search for a limited range of firearm-related material that would have provided circumstantial evidence of ownership of the sawed-off shotgun at issue, such as receipts or compatible ammunition, the warrant extended beyond such evidence to "[a]ny firearm capable of firing or chambered to fire any caliber ammunition." Put simply, the Fourth Amendment does not authorize the issuance of warrants to conduct fishing expeditions to find evidence that could assist officers in prosecuting suspects. *See Garrison*, 480 U.S. at 84.

The deputies further argue that any caliber of shotgun or receipts would show the possession and purchase of guns. But we fail to see how this gives the deputies probable cause, because the possession and purchase of guns by itself does not constitute contraband or evidence of a crime. *See Gates*, 462 U.S. at 238. As discussed above, the warrant did not include the information about Bowen's criminal record that could make his possession and purchase of guns a criminal offense, and thus such information cannot be considered in our analysis. *See Crowe*, 593 F.3d at 869. Moreover, while the district court concluded that the deputies had probable cause to search for "[a]rticles of personal property tending to establish the identity of the person or persons in control of the premise or premises," a ruling the Millenders do not challenge on appeal, the deputies do not argue that such probable cause justified their search for the broad range of firearms listed in the warrant. Nor could they. While we have upheld warrants authorizing searches for "[i]ndicia tending to establish the identity of persons in control of the premises," *Ewing v. City of Stockton*, 588 F.3d 1218, 1229 (9th Cir. 2009), the probable cause to search for such "indicia of control" usually refers to such items as "utility company receipts, rent receipts, cancelled mail envelopes, and keys," *United States v. Honore*, 450 F.2d 31, 33 (9th Cir. 1971), not to the full range of firearm and

firearm-related materials sought here. *See United States v. Whitten*, 706 F.2d 1000, 1009 (9th Cir. 1983) (upholding a warrant authorizing the seizure of a broad range of documents only to the extent the documents indicated "the ownership or occupancy" of a residence, and noting that without such a limitation the warrant's broad authorization "might have been unreasonable"), *abrogated on other grounds by United States v. Perez*, 116 F.3d 840, 844-46 (9th Cir. 1997) (en banc); *cf. United States v. Rettig*, 589 F.2d 418, 420-21, 423 (9th Cir. 1978) (invalidating a warrant allowing a search for indicia of the identity of the residents of a house when government agents used it as a pretext to search for evidence of a cocaine smuggling conspiracy).

**[11]** Although we are deferential to a magistrate's determination of probable cause and consider the language of a warrant and affidavit in a common sense and practical manner, *Gates*, 462 U.S. at 236, here we are unable to identify any basis, let alone a "substantial basis," *see Leon*, 468 U.S. at 915, for probable cause to search and seize the broad category of firearm and firearm-related materials set forth in the warrant. Accordingly, we find ourselves in that rare situation where we must conclude that the magistrate lacked a substantial basis for issuing the warrant for this broad range of items.

C

**[12]** We next consider the search warrant's authorization to search for all gang-related items. The affidavit contains two references to Bowen's alleged gang membership. It states that Bowen is "a known Mona Park Crip gang member," and it asserts, in the section justifying a request for night service, that Bowen "has gang ties to the Mona Park Crip gang based on information provided by the victim and the cal-gang data base." Neither of these assertions provides probable cause for a magistrate to conclude that "contraband or evidence of a crime," *Gates*, 462 U.S. at 238, would be found at Mrs. Millender's residence. Merely being a gang member or having

gang ties is not a crime in California. *People v. Gardeley*, 927 P.2d 713, 725 (Cal. 1996). The relevant California law "imposes increased criminal penalties" for gang membership only when the underlying criminal act is " 'for the benefit of, at the direction of, or in association with' a group that meets the specific statutory conditions of a 'criminal street gang,' " and when the act is done with the " 'specific intent to promote, further, or assist in any criminal conduct by gang members.' " *Id.* (quoting Cal. Penal Code § 186.22(b)(1)). Here, Messerschmidt himself stated he had no reason to believe that Bowen's assault on Kelly was related to gangs, and there is no evidence in the affidavit (or the record) to suggest otherwise. Because the deputies failed to establish any link between gang-related materials and a crime, the warrant authorizing the search and seizure of all gang-related evidence is likewise invalid.

## IV

Our conclusion that there was no probable cause for the broad categories of firearm- and gang-related items listed in the search warrant, and that the search warrant violated the Millenders' constitutional rights, is only the first step in our analysis of whether the deputies are entitled to qualified immunity. We must next consider whether the Millenders' constitutional rights were "clearly established" at the time of the deputies' alleged misconduct. *Pearson*, 129 S. Ct. at 816.

### A

**[13]** The Supreme Court has refined the application of the qualified immunity test in the Fourth Amendment context. *See Malley*, 475 U.S. at 344-46; *Groh*, 540 U.S. at 563-65. In private actions against officers who have executed constitutionally inadequate warrants, the Supreme Court has held that an officer loses qualified immunity only when "a reasonably well-trained officer in [the defendant officer's] position would have known that his affidavit failed to establish probable

cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345. This standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341.

**[14]** Despite this protection, the Supreme Court has preserved the right of individuals to seek relief in certain narrowly defined circumstances. *Malley* and *Groh*, the two leading Supreme Court cases in this context, deal with facts and arguments similar to the case before us. In *Malley*, plaintiffs sued a state trooper under § 1983 for applying for an arrest warrant that failed to establish probable cause. *Id.* at 337.[8] Rather than granting the officer absolute immunity, *Malley* held that officers should receive only qualified immunity because "it would be incongruous to test police behavior by the 'objective reasonableness' standard in a suppression hearing, *United States v. Leon*, 468 U.S. 897 (1984), while exempting police conduct in applying for an arrest or search warrant from any scrutiny whatsoever in a § 1983 damages action." *Malley*, 475 U.S. at 344. Accordingly, *Malley* held that officers would be entitled to qualified immunity in § 1983 actions only under the same facts that would allow the government to claim a good faith exception to the exclusionary rule in a suppression hearing. Said otherwise, officers lose immunity only "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* at 344-45 (citing *Leon*, 468 U.S. at 923).

*Malley* rejected the argument that the trooper was "shielded from damages liability because the act of applying for a warrant is *per se* objectively reasonable" and that he was "entitled to rely on the judgment of a judicial officer in finding that probable cause exists and hence issuing the warrant." *Id.* at

---

[8]Though *Malley* dealt with an arrest warrant, the opinion applies to both arrest and search warrants. *See* 475 U.S. at 344; *Marks v. Clarke*, 102 F.3d 1012, 1026 & n.31 (9th Cir. 1997) (applying *Malley* to search warrants).

345. According to *Malley*, that view of objective reasonableness was "at odds" with cases such as *Leon* and *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). *Malley*, 475 U.S. at 345. Rather, the pertinent question must be "whether a reasonably well-trained officer in [the defendant officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* If a reasonable officer would have known that the affidavit was fatally deficient, then the defendant's "application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest [or search]." *Id. Malley* declined to hold that an officer could rely on the determination of the magistrate, stating that "it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should" and, accordingly, it was "reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment." *Id.* at 345-46.

*Groh* offers an example of one of the rare cases described in *Malley* when a warrant is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," 475 U.S. at 345, notwithstanding the approval of a magistrate. In *Groh*, the plaintiff claimed his Fourth Amendment rights had been violated because the warrant authorizing the search and seizure of his property was invalid. 540 U.S. at 554-55. Although the defendant officer had prepared a detailed application for the warrant, the warrant itself included only a description of the plaintiff's residence, and it did not incorporate the application by reference. *Id. Groh* held that the warrant "was plainly invalid" because it totally failed to describe the things to be seized, let alone with particularity. *Id.* at 557. Accordingly, the Court concluded that the search conducted pursuant to the warrant was unconstitutional. *Id.* at 563. Rejecting the officer's assertion of qualified immunity, *Groh* reasoned that "just a simple glance[ ]would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 564.

Further, the Court held that the officer "may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid" because the officer himself prepared the invalid warrant. *Id.*

Accordingly, as *Malley* and *Groh* make clear, a plaintiff can proceed with a § 1983 action stemming from an officer's application for an invalid warrant in those limited situations when "a reasonably well-trained officer" in the defendant's situation would have known that the warrant did not establish probable cause. *Malley*, 475 U.S. at 345; *see Groh*, 540 U.S. at 564. When the warrant is so lacking in indicia of probable cause, officers cannot claim that they acted reasonably by seeking a warrant merely because a neutral magistrate approved the application; rather, officers must exercise their own "reasonable professional judgment." *Malley*, 475 U.S. at 346.

**[15]** In interpreting these precedents, we have emphasized the "distinction between warrants with disputable probable cause and warrants so lacking in probable cause that no reasonable officer would view them as valid." *KRL*, 512 F.3d at 1190; *see also United States v. Shi*, 525 F.3d 709, 731 (9th Cir.) ("Good faith reliance exists if the agents' affidavit establishes 'at least a colorable argument' for probable cause, and the agents relied on the search warrant in an objectively reasonable manner." (quoting *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006))), *cert. denied*, 129 S. Ct. 324 (2008). Where the "lack of probable cause was so obvious that any reasonable officer reading the warrant would conclude that the warrant was facially invalid," we have held that "[a]pproval by an attorney and a magistrate did not justify reasonable reliance." *KRL*, 512 F.3d at 1192 (citing *Kow*, 58 F.3d at 428-29).

B

While the deputies claim that "a reasonably well-trained officer" in their position would not have known that the

search warrant failed to establish probable cause, *Malley*, 475 U.S. at 345, they add little to their prior arguments. The deputies argue that they could have reasonably but mistakenly concluded that they had probable cause to seize the weapon found at the Millender residence because "they would not know if the suspect would be coming back and the officers would not want the suspect to gain access to more weapons and hurt other people, including the victim in this case." To the extent this argument differs from their "dangerousness" argument, *see supra* at pp. 12729-30, it also fails. Although officers may make a warrantless entry into a residence under certain exigent circumstances, such as when "they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury," *see Brigham City v. Stuart*, 547 U.S. 398, 400 (2006), the exigent circumstances doctrine is an exception to the warrant requirement, *id.* at 403, not an authorization for the deputies to apply for a warrant that is not supported by probable cause. The deputies also assert they could have been reasonably mistaken as to whether the underlying crime was gang-related. This argument borders on the frivolous, given Messerschmidt's statement that he had no reason to hold such a belief, and the absence of any evidence that the crime at issue was gang-related.

**[16]** The deputies' arguments cannot change the reality that the warrant in this case suffered a "glaring deficiency." *Groh*, 540 U.S. at 564. Neither it nor the affidavit established probable cause that the broad categories of firearms, firearm-related material, and gang-related material described in the warrant were contraband or evidence of a crime. Moreover, a reasonable officer in the deputies' position would have been well aware of this deficiency. The affidavit indicated exactly what item was evidence of a crime, the black sawed-off shotgun with a pistol grip, and reasonable officers would know they could not undertake a general, exploratory search for unrelated items unless they had additional probable cause for those items. *See SDI Future Health*, 568 F.3d at 702-03; *In re*

*Grand Jury Subpoenas*, 926 F.2d at 857; *VonderAhe*, 508 F.2d at 369-70. Under these circumstances, we cannot say that an officer could reasonably but mistakenly believe that the search warrant established "a colorable argument for probable cause." *See Shi*, 525 F.3d at 731. Rather, the warrant here was "plainly invalid." *Groh*, 540 U.S. at 557.

Citing the dissenting opinions in *Malley* and *Groh*, *see* Dissent at 12748 n.8, 12748-50 & n.10, 12760, the dissent would hold that the officers acted in an objectively reasonable manner as a matter of law because they "reasonably relied" on the review and approval of "their superiors, the district attorney, and the magistrate to correct the alleged over breadth in the search warrant," Dissent at 12757. Judge Silverman likewise suggests that the deputies are entitled to qualified immunity because they obtained a warrant, consulted with their superiors, and acted in good faith. Silverman Dissent at 12767. We cannot accept these propositions, however, because they conflict with the majority opinions in *Malley* and *Groh*, which imposed on police officers the independent responsibility to ensure there is at least a colorable argument for probable cause, and rejected the factors suggested by the dissenting justices for giving police officers even further protection from liability. *See Groh*, 540 U.S. at 563-64; *Malley*, 475 U.S. at 345-46. Nor can we agree that the officers were objectively reasonable in obtaining a search warrant for a broad range of firearms and gang indicia because the suspect was an ex-felon, the firearms were inherently dangerous, and the firearms were specifically described. Dissent at 12759-60. As explained above, under basic Fourth Amendment principles, a search warrant is not supported by probable cause unless the affidavit establishes that the items in the search warrant are contraband or evidence of a crime; neither information known only to the officer, the criminal status of the suspect, nor the dangerousness of the items listed in the warrant establishes probable cause. The dissent's desire to transform these long-standing rules into a more "workable guideline," Dissent at

12752, does not excuse the police officers from compliance with the existing rules mandated by the Supreme Court.[9]

[17]  The deputies here had a responsibility to exercise their reasonable professional judgment. *See Malley*, 475 U.S. at 346. As *Malley* recognized, "ours is not an ideal system," and as such in circumstances such as these a neutral magistrate's approval (and, a fortiori, a non-neutral prosecutor's, *see Coolidge*, 403 U.S. at 449-50) cannot absolve an officer of liability. *Malley*, 475 U.S. at 345.[10] Accordingly, the deputies are not entitled to qualified immunity with respect to the Millenders' claim that their role in obtaining and executing the warrants violated their constitutional rights.

## V

"While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recog-

---

[9]The dissent also suggests that the officers' reliance on the search warrant was objectively reasonable because only two sections of the warrant lacked probable cause, and those sections "do not appear to have been very important either when the warrant was initially sought or later." Dissent at 12763; *see* Dissent at 12758-59. In fact, those two sections of the warrant set forth the entire description of the items to be seized, and the district court invalidated all but a single sentence. *Supra* at p. 12720. Although we have held that the invalid portions of a search warrant may be severed from the valid portions, "severance is not available when the valid portion of the warrant is 'a relatively insignificant part' of an otherwise invalid search." *In re Grand Jury Subpoenas*, 926 F.2d at 858 (quoting *Spilotro*, 800 F.2d at 967). Here, even though the district court upheld a single sentence and even though the description of the items to be searched for and seized comprised only two paragraphs, the officers' reliance on the warrant as a whole was not reasonable.

[10]Nor is this a case where the warrant was defective because the magistrate made an error, as in *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984), in which the Court declined to suppress evidence obtained with an improper warrant form where the authorizing magistrate assured the detective that he would make the changes necessary to ensure its validity. Here, Messerschmidt prepared the overbroad warrant himself, and the magistrate gave no assurances that he would fix errors in the warrant.

nized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Garrison*, 480 U.S. at 87. In the majority of cases, officers who reach a reasonable but mistaken conclusion that a warrant was justified by probable cause will be shielded from suit by qualified immunity. *See Malley*, 475 U.S. at 341. "But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar*, 338 U.S. at 176. Where, as here, the warrant was so facially invalid that no reasonable officer could have relied on it, the deputies are not entitled to qualified immunity, and the Millenders can proceed with their § 1983 claim.

**AFFIRMED.**

CALLAHAN, Circuit Judge, with whom TALLMAN, Circuit Judge joins, dissenting:

Although the majority's opinion nicely lays out the law applicable to a determination of qualified immunity, my review of the law and the facts in this case require that I dissent. I address four matters. First, I take issue with the majority's determination that the warrant constitutionally could not provide for the search and seizure of firearms other than the sawed-off shotgun. Second, in reviewing the applicable case law, the majority fails to appreciate the factors courts have used to transform an abstract standard — did the officer reasonably rely on review by counsel and a magistrate — into a workable guide for a line officer. Third, I would find that the totality of the circumstances in this case compels a finding that the line officer reasonably relied on his supervisors, the district attorney, and the magistrate to determine the constitutional limits of the search warrant. Finally, I am concerned that the majority's parsing of the search warrant is likely to

encourage uncertainty and needless litigation. I would grant the officer qualified immunity.

# I

Our differing views on the warrant's provision for the search and seizure of firearms are revealed by our respective applications of *United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986), which sets forth the framework for determining a warrant's sufficiency. There we held that "[i]n determining whether a description is sufficiently precise," we should concentrate on one or more of the following:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Id.* at 963 (citations omitted).

The majority admits that there was probable cause to search for and seize the "black sawed-off shotgun with a pistol grip," but objects that "the affidavit does not set forth any evidence indicating that Bowen owned or used any other firearms, that such firearms were contraband or evidence of a crime, or that such firearms were likely to be present at the Millenders' residence." Op. at 12724. This approach overlooks the fact that the search warrant was accompanied by an arrest warrant for Bowen, the real object of the search, who the officer believed resided at the residence. Bowen was reasonably considered to be dangerous. He had fired a shotgun in public at Kelly, was a member of a street gang, and had a criminal record including prior felonies.[1] Because of Bowen's dangerousness, the

---

[1]Although the affidavit in support of the search warrant did not explicitly state that Bowen had a criminal record, this can be inferred from its

deputies requested nighttime service of the warrant. The magistrate approved nighttime service, and the district court held that the facts specified in the affidavit were sufficient to justify nighttime service. The district court also concluded that the arrest warrant was facially valid and that its authorization to search for evidence tending to establish who controlled the premises was constitutional. Op. at 12720.

Given this context, the officers had probable cause to search for and seize any firearms in the home in which Bowen, a gang member and felon, was thought to reside. In *Illinois v. Gates*, 462 U.S. 213, 238 (1983), the Supreme Court held that probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[2] *See also United States v. Grubbs*, 547 U.S. 90, 95 (2006). Firearms by their very nature are dangerous and numerous laws render their possession by convicted felons criminal. *See, e.g.*, 18 U.S.C. § 922(g). Thus,

---

statement that his membership in the Mona Park Crip gang was based, in part, on information in "the cal-gang data base." This database is a California-funded, law enforcement-maintained, database of criminal street gangs and their members including criminal histories and activities. *See http://ag.ca.gov/calgang.* Further, the majority notes first that the officer knew that Bowen had several previous felony convictions and second that Bowen was a "third strike candidate" under California law. Op. at 12719.

[2]The Supreme Court explained:

we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations. . . . The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

547 U.S. at 95.

in light of the facts known to the officer, i.e., that Bowen had recently fired a shotgun at his girl friend, was a gang member, was a felon, and presumably was armed, there was at least a "fair probability" not only that there might be firearms in the house in which Bowen was believed to be residing, but that such firearms would be "contraband or evidence of a crime."[3] Moreover, the safety of all involved, both the officers and the inhabitants of the home, requires that officers seeking the nighttime arrest of a dangerous felon be allowed to seize any firearm that they come across in their search for that individual or for evidence that is otherwise properly covered by the search warrant.[4] Indeed, securing any weapons found during the search is justified to protect the officers executing the warrant from harm while doing so.

Once it is understood that there was a fair probability that any firearms found in the house in which Bowen was thought to reside would be contraband or evidence of a crime,[5] the warrant meets the second and third provisions of the *Spilotro* framework. The warrant sets out firearms and firearms-related

---

[3]This is not a *per se* rule as suggested by the majority. *See* op at 12729. Rather, the specific factors set forth above meet the requirement of probable cause set forth in *Gates*, 462 U.S. at 238.

[4]The majority notes that a sawed-off shotgun can be broken down into separate pieces for easy concealment, but insists that the "deputies' probable cause extended only to the disassembled pieces of the sawed-off shotgun with a pistol grip." Op. at 12727-28. It also declines to "reach the question whether the deputies could justify the seizure of Mrs. Millender's gun under the plain view doctrine," because the issue was not raised below and is not a pure question of law. Op. at 12730 n. 4. However, once the permissible scope of the search is defined as a search for disassembled parts of the sawed-off shotgun, then an officer is entitled to search anywhere that any firearm might be hidden. In other words, allowing for the search for other weapons does not expand the areas that the police may search beyond those that might also contain part of a disassembled shotgun.

[5]Indeed, if the shotgun the officers seized had been registered to Bowen, or if it were unregistered and under Bowen's control, it most likely would have been contraband or evidence of a crime.

items in objective language that allowed the officers to differentiate what items they might seize.[6] Furthermore, as any firearm was likely to be contraband or evidence of a crime, a more particular description was neither required nor desirable. Accordingly, I dissent from the majority's determination that the warrant's provision for the search and seizure of firearms was unconstitutional.[7]

---

[6]The majority objects that the "affidavit does not set forth any evidence indicating that Bowen owned or used any other firearms, that such firearms were contraband or evidence of a crime, or that such firearms were likely to be present at the Millenders' residence." Op. at 12724. The majority further comments that "nothing in the warrant or the affidavit provides any basis for concluding that there was probable cause to search for or seize the generic class of firearms." Op. at 12724. This perspective fails to appreciate that Bowen was a felon, demonstrably dangerous, and a gang member who was wanted for shooting at his ex-girl friend in public. These facts alone are sufficient to justify the search for firearms during a nighttime search (or at least a reasonable officer could think so). The cases cited by the majority, *Grubbs*, 547 U.S. at 95, and *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991), are not to the contrary. In *Grubbs*, the Supreme Court addressed the anticipatory nature of warrants and commented that "where the police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed." 547 U.S. at 95. The cited section of *In re Grand Jury Subpoenas*, 926 F.2d at 857, concerned the particularity and breadth of the warrant. Neither case dealt with items such as firearms which are inherently dangerous and may not be possessed by certain felons. Here, the officers had a reasonable suspicion that Bowen would have firearms and that the firearms would be contraband, if not evidence of crimes.

[7]The relationship between gang-related indicia and the offense for which Bowen was sought is admittedly more attenuated. Accordingly, I do not disagree with the majority's determination that this provision of the warrant was overbroad. However, as explained later in this dissent, when viewed in context, the line officers' inclusion of the provision in the warrant was reasonable.

## II

### A.    Supreme Court Authority

The majority and I agree that the standard for determining qualified immunity has been set forth by the Supreme Court in *Malley v. Griggs*, 475 U.S. 333, 345-46 (1986) and *Groh v. Ramirez*, 540 U.S. 551 (2004). Moreover, there is little difference in our reading of these opinions in the abstract. Rather, we differ on the application of the qualified immunity test to a front line police officer's request for an arrest warrant and accompanying search warrant. The majority's position is difficult to reconcile with the Fourth Amendment's preference for searches authorized by neutral and detached magistrates.

In *Malley*, the Supreme Court considered a claim that a police officer caused the plaintiffs to be unconstitutionally arrested by presenting a judge with an affidavit which failed to establish probable cause. 475 U.S. at 337. The Court first rejected an argument that the police officer was entitled to absolute immunity. *Id.* at 340-41. After explaining the basis for adopting an "objective reasonableness" standard, the Court commented:

> We also reject petitioner's argument that if an officer is entitled to only qualified immunity in cases like this, he is nevertheless shielded from damages liability because the act of applying for a warrant is *per se* objectively reasonable, provided that the officer believes that the facts alleged in his affidavit are true. Petitioner insists that he is entitled to rely on the judgment of a judicial officer in finding that probable cause exists and hence issuing the warrant. This view of objective reasonableness is at odds with our development of that concept in *Harlow* and *Leon.* In *Leon,* we stated that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would

have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n.23, . . . The analogous question in this case is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Id.* at 345-46 (footnotes omitted). The Court offered additional guidance in the following footnote:

Notwithstanding petitioner's protestations, the rule we adopt in no way "requires the police officer to assume a role even more skilled . . . than the magistrate." . . . It is a sound presumption that "the magistrate is more qualified than the police officer to make a probable cause determination," *ibid.*, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable. But it is different if no officer of reasonable competence would have requested the warrant, *i.e.*, his request is outside the range of the professional competence expected of an officer. If the magistrate issues the warrant in such a case, his action is not just a reasonable mistake, but an unacceptable error indicating

gross incompetence or neglect of duty. The officer then cannot excuse his own default by pointing to the greater incompetence of the magistrate.

*Id.* at 346 n.9.[8]

The second Supreme Court case relied on by the majority, *Groh*, provides guidance on the application of the *Malley* standard. In *Groh*, the warrant completely failed to identify the items to be searched.[9] 540 U.S. at 554. The Supreme Court held that the warrant was "plainly invalid," *id.* at 557, and that "even a cursory reading of the warrant in this case — perhaps just a simple glance — would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 564. Accordingly, the Court declined to allow petitioner to invoke the magistrate's approval of the warrant as shielding him from liability for preparing an invalid warrant that was contrary to his department's own guidelines. *See* 540 U.S. at 564.

---

[8]Justice Powell was right when joined by then-Justice Rehnquist, he issued a concurring and dissenting opinion criticizing the majority for giving "little evidentiary weight to the finding of probable cause by a magistrate or judicial officer." *Id.* at 350. Justice Powell urged:

> The police, where they have reason to believe probable cause exists, should be encouraged to submit affidavits to judicial officers. I therefore believe that in a suit such as this, the Court should expressly hold that the decision by the magistrate is entitled to substantial evidentiary weight. A more restrictive standard will discourage police officers from seeking warrants out of fear of litigation and possible personal liability. The specter of personal liability for a mistake in judgment may cause a prudent police officer to close his eyes to facts that should at least be brought to the attention of the judicial officer authorized to make the decision whether a warrant should issue.

*Id.* at 353-54 (footnote omitted).

[9]The Court noted that "[i]n the portion of the form that called for a description of the 'person or property' to be seized, petitioner typed a description of respondents' two-story blue house rather than the alleged stockpile of firearms." 540 U.S. at 554.

Despite the fact that the warrant was facially invalid, four Justices dissented. In his dissent, Justice Kennedy, joined by Chief Justice Rehnquist, stated that the central question is whether "someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment." 540 U.S. at 566. He commented that an officer "may be unaware of existing law and how it should be applied," "may misunderstand important facts about the search and assess the legality of his conduct based on that misunderstanding," or "may misunderstand elements of both the facts and the law." *Id.* at 566-67. Justice Kennedy asserted that the "qualified immunity doctrine applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* at 567.

Justice Kennedy went on to assert that language in *United States v. Leon*, 468 U.S. 897 (1984), was not applicable to the situation before the Court because the respondents "do not make the usual claim that they were injured by a defect that led to an improper search" but "were injured simply because the warrant form did not contain the correct description of the property to be seized even though no property was seized." *Id.* at 570-71. He concluded that the Court "has stressed 'the purpose of encouraging recourse to the warrant procedure' can be served best by rejecting overly technical standards when courts review warrants." *Id.* at 571 (quoting *Gates*, 462 U.S. at 237).

Justice Thomas filed a separate dissenting opinion, joined by Chief Justice Rehnquist and Justice Scalia, which in addition to questioning whether the underlying search was unconstitutional, held that the officer was entitled to qualified immunity. He objected that the Court had used an inappropriate "high level of generality" to establish a clear violation of the Constitution.[10] Instead, he opined that the focus should be

---

[10]Justice Thomas explained:

The qualified immunity inquiry rests on "the 'objective legal rea-

on " 'the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officer possessed.' " *Id.* at 578 (quoting *Anderson*, 583 U.S. at 641).

A third Supreme Court decision, *Leon*, 468 U.S. 897, is also instructive. In *Leon*, the Supreme Court adopted a good-faith exception for the exclusionary rule where evidence had been obtained as a result of a warrant that was subsequently determined to lack probable cause. In doing so, the Court stressed that the "detached scrutiny of a neutral magistrate . . . is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer." *Id.* at 913-14. The Court noted that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determina-

---

sonableness' of the action, *Harlow* [*v. Fitzgerald*, 457 U.S. 800, 819 . . . (1982)], assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. at 639 . . . The outcome of this inquiry "depends substantially upon the level of generality at which the relevant 'legal rule' is . . . identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause . . . violates a clearly established right." *Ibid.* To apply the standard at such a high level of generality would allow plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Ibid.* The Court in *Anderson* criticized the Court of Appeals for considering the qualified immunity question only in terms of the petitioner's "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Id.* at 640.

540 U.S. at 578.

tion." *Id.* at 914 (internal citation omitted). The Court, how-
ever, noted that deference was not boundless, and did not
preclude inquiry into (1) "the knowing or reckless falsity of
the affidavit [supporting the warrant]," (2) whether the magis-
trate "merely served as a rubber stamp for the police," and (3)
whether the affidavit provided the magistrate "with a substan-
tial basis for determining the existence of probable cause." *Id.*
at 914-15 (quoting *Gates*, 462 U.S. at 239). Thus, a reviewing
court "may properly conclude that, notwithstanding the defer-
ence that magistrates deserve, the warrant was invalid because
the magistrate's probable-cause determination reflected an
improper analysis of the totality of the circumstances, . . . or
because the form of the warrant was improper in some
respect." *Id.* at 915 (internal citation omitted).

Nonetheless, the Court noted that "where the officer's con-
duct is objectively reasonable, excluding the evidence will not
further the ends of the exclusionary rule in any appreciable
way: for it is painfully apparent that . . . the officer is acting
as a reasonable officer would and should act in similar cir-
cumstances." *Id.* at 919-20 (internal quotation marks and cita-
tion omitted). The Court commented that "[i]t is the
magistrate's responsibility to determine whether the officer's
allegations establish probable cause," and "[i]n the ordinary
case, an officer cannot be expected to question the magis-
trate's probable-cause determination or his judgment that the
form of the warrant is technically sufficient." *Id.* at 920. The
Court concluded that "[p]enalizing the officer for the magis-
trate's error, rather than his own, cannot logically contribute
to the deterrence of Fourth Amendment violations." *Id.*

Finally, the Court explained that the officer's reliance on
the magistrate's probable-cause determination must be objec-
tively reasonable. *Id.* at 922. The "good faith inquiry is con-
fined to the objectively ascertainable question whether a
reasonably well-trained officer would have known that the
search was illegal despite the magistrate's authorization." *Id.*
at 920 n.23. The Court then indicates that suppression would

be appropriate where (1) the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) where the affidavit was "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable" (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)); or (4) the warrant was facially deficient "in failing to particularize the place to be searched or the things to be seized." *Id.* at 923.

Although the case at bar concerns qualified immunity and not the suppression of evidence, the Court's discussion in *Leon* of the role of the magistrate and deference to the magistrate informs — as the majority recognizes — our analysis of the officer's conduct in our case.

In sum, I agree with the majority that pursuant to *Malley* and *Groh*, the question is whether a reasonably well-trained officer in the defendant's situation would have known that the warrant did not establish probable cause. Op. at 12734-35. But an appreciation of the specific language in the Supreme Court's opinions should lead us to focus on those factors that transform an abstract standard into a workable guideline for a line officer.

## B.   Ninth Circuit Authority

A review of our own precedent reveals and reinforces the factors that should be considered in determining whether an officer who sought a warrant reasonably relied on review by counsel and a magistrate. In *KRL v. Estate of Moore*, 512 F.3d 1184 (9th Cir. 2008) ("*KRL II*"), we reiterated the Supreme Court's perspective that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1189 (quoting *Malley*, 475 U.S. at 341). We noted that courts "treat magistrates as more qualified than police officers to make determinations of probable cause," and that

as a general matter an officer cannot be expected to question a magistrate's probable cause determination. *Id*. (citing *Leon*, 468 U.S. at 921). We stated that "[o]fficers lose their shield of qualified immunity 'only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.' " *Id*. at 1189-90 (quoting *Malley*, 475 U.S. at 344-45).

We then cited *Ortiz v. Van Auken*, 887 F.2d 1366 (9th Cir. 1989), as an example of where it was reasonable for an officer to rely on an invalid search warrant that "was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *KRL II*, 512 F.3d at 1190. In *Ortiz*, the officers, relying on four anonymous telephone calls apparently from the same individual, sought a warrant to search a residence in which the anonymous informant alleged that explosives were stored. 887 F.2d at 1367-68. The officers prepared a warrant and took it first to a deputy district attorney and then to a judge, both of whom approved the warrant. *Id*. We held that the officers were entitled to qualified immunity in part because review by the deputy district attorney and the judge weighed in favor of finding that the officers' belief was not entirely unreasonable. *Id*. at 1370. We further noted that the warrant was not facially overbroad.[11]

---

[11]We explained:

> Ortiz complains that the warrant lacked probable cause — the very situation confronted by the Supreme Court in *Leon*. . . . 468 U.S. at 921 . . . . In explaining the parameters of the good faith exception, *Leon* distinguished between warrants that are facially invalid for lack of particularity and those so lacking in indicia of probable cause as to render an officer's belief in its existence "entirely unreasonable." *Id.* at 923. Determining whether certain facts constitute probable cause differs from ascertaining whether a warrant is so facially overbroad that it precludes reasonable reliance. *Leon* teaches that inadequate probable cause does not necessarily render a warrant facially invalid nor prevent reasonable belief in the existence of probable cause. The existence of probable cause may be difficult to determine. Recognizing this,

The panel in *KRL II* then contrasted *Ortiz* with *United States v. Kow*, 58 F.3d 423 (9th Cir. 1955). In *Kow*, the warrant "authorized the seizure of virtually every document and computer file at [the business]." *Id.* at 427. In *KRL II*, we explained that in *Kow*, "approval by an attorney and a magistrate did not amount to exceptional circumstances justifying reasonable reliance by the officers, because the lack of probable cause was so obvious that any reasonable officer would conclude that the warrant was facially invalid."[12] 512 F.3d at 1190. The panel also noted that in *United States v. Stubbs*, 873 F.2d 210 (9th Cir. 1989), we held that because the war-

---

*Leon* and its progeny encourage officers to consult legal officers and rely on their opinions. Once this is accomplished, "'there is literally nothing more the policeman can do in seeking to comply with the law.' " *Id.* at 921, *quoting Stone v. Powell*, 428 U.S. 465, 498, . . . (1976) (Burger, C.J., concurring).

887 F.2d at 1370-71.

[12]*Kow* was an appeal from an order suppressing evidence. 58 F.3d at 428. It contains the following comment on severability relevant to our case:

The government maintains that even if some categories of the warrant were overbroad, certain sections of the warrant were valid and evidence seized pursuant to these sections should not be suppressed. *See United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. . . . (1984). However, "severance is not always possible." *Cardwell*, 680 F.2d at 78. In particular, "[i]f no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required. Otherwise the abuses of a general search would not be prevented." *Id.*

Here, none of the fourteen categories of seizable documents was limited by reference to any alleged criminal activity. Only Category G, authorizing seizure of tax returns since 1983, was limited as to time. Although Category M, authorizing the seizure of all documents related to HK Video's dealings with other businesses sublicensed by HK T.V., arguably was not overbroad, "severance is not available when the valid portion of the warrant is 'a relatively insignificant part' of an otherwise invalid search." *In re Grand Jury Subpoenas*, 926 F.2d at 858 (quoting *Spilotro*, 800 F.2d at 967).

rant contained no reference to criminal activity and merely described broad classes of documents, its "facial invalidity was obvious enough to preclude reasonable reliance." 512 F.3d at 1190 (citing *Stubbs*, 873 F.3d at 212). In both *Kow* and *Stubbs* the warrants were obviously invalid on their faces.

In *KRL II*, we were called upon to determine reasonable reliance in a more complex setting involving two warrants.[13] We held that the officers were entitled to qualified immunity on a first warrant based on their reliance on review by a district attorney and the magistrate because it was not "so lacking in indicia of probable cause as to render official belief unreasonable," implicitly recognizing "that reasonable minds could disagree as to whether probable cause supported the January 11 warrant."[14] *Id.* at 1191 (internal citation omitted). We denied the officers qualified immunity on the second warrant because "[e]ven if probable cause existed to believe KRL was 'permeated with fraud' since 1995, no reasonable officer could conclude that the discovery of a 1990 ledger and several checks showed that KRL had been primarily engaged in fraudulent activity since 1990." *KRL I*, 384 F.3d at 1117. We

---

[13]*KRL II*, 512 F.3d 1184, is our second opinion in the case. We previously addressed issues of absolute and qualified immunity arising out of the underlying warrants in *KRL v. Moore*, 384 F.3d 1105 (9th Cir. 2004) ("*KRL I*"). In this opinion we explained that in April 1998, KRL had purchased a defunct gasoline station and had an underground gasoline tank removed. *Id.* at 1108. The district attorney commenced an investigation into possible environmental contamination and procured a first warrant providing for the seizure of a broad range of documents created since January 1, 1995. *Id.* at 1108-09. The officers undertook a search pursuant to the warrant, but after finding evidence not within the scope of the warrant, they returned to the court and sought a second warrant, authorizing seizure of documents dating back to 1990. *Id.* at 1109.

[14]We explained that the first warrant " 'had a more reasonable temporal limit' (limiting the search to documents dating back to 1995), 'it alleged fraudulent activity and tax evasion dating to 1997,' 'it alleged hazardous water violations in 1995 and 1996,' and 'it alleged that Womack withdrew funds from KRL for personal expenses and illegal activities.' " 512 F.3d at 1191 (quoting *KRL I*, 384 F.3d at 1116).

concluded that "approval by an attorney and a magistrate did not justify reasonable reliance, because the lack of probable cause was so obvious that any reasonable officer reading the warrant would conclude that the warrant was facially invalid. *See Kow*, 58 F.3d at 428-29." *KRL II,* 512 F.3d at 1192.

Our decisions in these cases illustrate that the objectively reasonable standard must be applied on a case-by-case basis. They also suggest that an officer's reliance on the review by a district attorney and magistrate is reasonable at least until the officer himself seeks to broaden the search warrant well beyond the scope initially approved. Even then, reliance is appropriate unless any reasonable officer would conclude that "the warrant was facially invalid."

## C.    Analysis

Our review of Supreme Court and Ninth Circuit cases addressing reasonable reliance reveals certain considerations that transform what might otherwise be an abstract question into a working guide for police officers. Among these considerations are: (1) whether it was reasonable for the officer to apply for the warrant, *see Malley*, 475 U.S. at 345; (2) whether there was sufficient probable cause to issue a warrant, *see id*.; (3) whether the warrant was facially invalid, *see Groh*, 540 U.S. at 564; (4) whether the warrant properly identified the limited matters to be searched, *see Kow*, 58 F.3d at 427; *see also Stubbs*, 873 F.2d at 212; (5) whether the officer fairly sought review by his or her superiors, counsel and a magistrate, *see KRL II*, 512 F.3d at 1190; and (6) whether the officer's misunderstanding was reasonable even where there was no probable cause. *See Leon*, 468 U.S. at 914.

All of these factors should be applied in a manner consistent with the Supreme Court's perspective that qualified immunity should "amply" protect "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. 341; *see also KRL II* , 512 F.3d at 1189.

## III

The application of these factors to the present case compels a determination that the officers reasonably relied on their superiors, the district attorney, and the magistrate to correct the alleged over breadth in the search warrant.

First, as this case comes to us, we accept that it was reasonable for the officers to apply for the warrant and that there was sufficient probable cause for the warrant to issue. In the district court, plaintiffs challenged whether the affidavit established probable cause to believe that Bowen could be found at the residence, but the district court denied that claim. On this interlocutory appeal from the district court's denial of qualified immunity, we accept the district court's determination that there was sufficient probable cause to allow the officer to apply for the nighttime search warrant and for the magistrate to issue the warrant.[15]

Second, the warrants were facially valid. They adequately identified the location to be searched, the person to be arrested, and the items to be seized. Regardless of whether there was probable cause to search for firearms and indicia of

---

[15]Indeed, the decision to conduct a nighttime search of Mrs. Millender's home may be the most disturbing decision in this case, as Mrs. Millender appears to have had no connection with the underlying crime. Judge Fernandez, a member of the initial three-judge panel, recognized this in his concurring opinion, noting: "[w]hen I read and reread the warrant and the affidavit that supports it, I come away with the feeling that there is extremely little support for the search of a third person's home for all firearms and ammunition." *Millender v. County of Los Angeles*, 564 F.3d 1143, 1151 (9th Cir. 2009). Mrs. Millender's connection to Bowen appears to be that at one time she had been Bowen's foster mother. However, the district court held that the decision to conduct a nighttime search of the residence was reasonable, and accordingly, we view the warrant in that light.

gang membership, these limited items were properly identified on the face of the warrant.[16]

Third, Officer Messerschmidt scrupulously followed the proper procedures in seeking the arrest and search warrants. The warrant affidavit was reviewed by his sergeant and Messerschmidt consulted a lieutenant. Moreover, the warrants were reviewed by a deputy district attorney before they were presented to, reviewed by, and signed by a magistrate. Messerschmidt followed the Supreme Court directions in *Leon* to seek the "detached scrutiny of a neutral magistrate." 468 U.S. at 913.

Despite accepting that there were reasonable grounds for seeking the warrants, that there was sufficient probable cause to issue the search warrant, that the warrant was facially valid, and that the proper procedures were followed to have the warrants reviewed and approved by a neutral magistrate, the majority nonetheless concludes that the absence of probable cause for two sections of the warrant was so obvious that the officer is not entitled to qualified immunity. Despite our observation, and the Supreme Court's observation, that "reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," *KRL II*, 512 F.3d at 1189 (quoting *Leon*, 468 U.S. at 914), the majority, in essence, considers the officer to have been incompetent or dishonest. Initially, it should be noted that the majority does not suggest that the officer was dishonest. Although the plain-

---

[16]The majority's concern with the "breadth" of the warrant is really a concern with whether there was probable cause to support the questioned provisions of the warrant. *See* Op. 12722, 12728. In the case relied upon by the majority, *United States v. SDI Future Health*, 569 F.3d 684 (9th Cir. 2009), we explained that for a warrant not to be "overbroad" there must be probable cause to seize the particular thing named in the warrant, and that this means "a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of circumstances." *Id.* at 702-03 (quoting *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007)). Probable cause is discussed later in this dissent.

tiffs in the district court argued that the officer had failed to present the magistrate with all the relevant facts, the district court rejected those contentions, and there is nothing in the majority's opinion that resurrects that contention. Rather, the majority's opinion basically holds that the lack of relationship between the charged crime by Bowen and certain items described in the search warrant was so obvious that the officer may be held personally liable for having entertained a contrary thought. Of course, in light of my perspective on whether the search might include firearms other than the sawed-off shotgun, I think that the officer's inclusion of other firearms in the warrant, if not proper, was certainly objectively reasonable.

How could the officer have thought that he could search for indicia of gang membership? We must ask this question based on what the officer knew when he prepared his affidavit. Here, we agree that the officer knew that Bowen had fired a sawed-off shotgun at a person in public, that he was a felon, and that he had ties with a street gang. We also accept that the officer reasonably believed that Bowen was "hiding out" at the house on 120th Street. Why are these "facts" not sufficient to allow the officer initially to include a search for indicia of gang membership in his warrant application? Indeed, the affidavit in support of the warrant offered precisely this line of reasoning.[17]

It appears that ultimately there was no evidence of a link

---

[17]The officer set forth his specialized training in the field of gang-related crimes, and his participation in hundreds of interviews with individuals who had been sentenced or were about to be sentenced. He stated that these interviews provided him with "information pertaining to the manners in which gang-related assaults are committed, the motives for such assaults, and the concealment of weapon(s) used in such assaults." He further stated that his investigation had shown that Bowen had gang ties to the Mona Park Crip gang, and asserted that this fact in connection with the nature of the underlying crime justified night service of the warrant.

between Bowen's assault on Kelly with a deadly weapon and his membership in a street gang, but the officer did not know this when he applied for the warrant. Given that Bowen was a felon, a gang member, and had used a sawed-off shotgun, the possession of which might well be illegal, the officer may reasonably have conceived of possible ties between the crime, the weapon and the gang. I do not disagree with the district court's and the majority's determination that nevertheless there was insufficient probable cause to support a warrant for indicia of gang membership. Rather, my point is only that it was reasonable for the officer to think that there might be sufficient probable cause, at least to include the request in the initial application that would then be reviewed by his superiors, a deputy district attorney and a magistrate. *See KRL II*, 512 F.3d at 1192 (indicating that officers should not be required "to question reasonable assessments of probable cause by government attorneys and magistrates").

The officer may well have made factual and legal mistakes. *See Groh*, 540 U.S. at 566-67 (J. Kennedy, dissenting). He may have thought that the facts that Bowen was a felon, a gang member, and had committed an assault with a deadly weapon created probable cause to search for indicia for gang membership. He was wrong, but objectively viewed, his mistake was not objectively unreasonable.[18]

---

[18]Contrary to the majority's assertion, *see* Op. at 12739-40, this conclusion is not based on the dissenting opinion in *Malley* and *Groh*, but on the application of the standard set forth in those opinions. The determination of whether a "well trained officer would have known that the search was illegal despite the magistrate's authorization" (*Leon*, 468 U.S. at 922 n.23), requires an evaluation of the particular facts of the case. In *Malley*, the Court did not determine whether "petitioner's conduct . . . was in fact objectively reasonable." 475 U.S. at 345 n.8. In *Groh*, the Court referred to this as "the particularity requirement." 540 U.S. at 563. It is in the application of the "particularity requirement" to a specific fact situation that the dissents in *Malley* and *Groh* are relevant when evaluating whether the officer "should not have applied for the warrant." *Malley*, 475 U.S. at 545.

One way of ascertaining whether a mistaken belief was reasonable is to compare it to other cases where we have found that an officer was not entitled to qualified immunity. I can find no clear precedent that supports the majority's conclusion. In *Kow*, 58 F.3d 423, "the lack of probable cause was so obvious that any reasonable officer would conclude that the warrant was facially invalid." *KRL II*, 512 F.3d at 1190. Similarly, the warrant in *Stubbs*, 873 F.2d 210, was facially invalid. *KRL II*, 512 F.3d at 1190. Perhaps the most analogous case is *KRL II*. There, we denied qualified immunity to Officer Hall because we found that "*no reasonable officer* could conclude that the discovery of a 1990 ledger and several checks showed that KRL had been primarily engaged in fraudulent activity since 1990." 512 F.3d at 1192 (quoting *KRL I*, 384 F.3d at 1117). However, our denial of qualified immunity was based on: (1) Hall's "leadership role in the overall investigation;" (2) our factual determination that "the discovery of a ledger and several checks predating the allegedly fraudulent activity by five years did not provide sufficient probable cause to search for documents dating back to 1990;" and (3) our conclusion that the warrant was obviously facially invalid. *KLR II*, 512 F.3d at 1192-93. Although Officer Messerschmidt may have been in charge of the investigation of Bowen, he did not have a leadership position similar to that held by Hall in *KRL II*.[19] Furthermore, his incorrect factual conclusion was not as far-fetched as that in issue in *KRL II*, and the warrant was not obviously facially invalid.

It might also be noted that in 2003, when Messerschmidt sought the warrant, neither of our opinions in *KRL* had issued. However, we had decided *Ortiz*, 887 F.3d 1366. In that case, the officer sought a warrant to search a home for weapons and explosives based on only four telephone calls by the same anonymous person. *Id*. at 1367. Nonetheless, while finding

---

[19]Unlike Officer Hall who executed the search at issue in *KRL II*, 384 F.3d at 1109, Officer Messerschmidt was assigned to traffic control on the street during the search of the Millender residence.

that there was no probable cause to support the warrant, we granted the police officer qualified immunity, commenting that an "error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not police officers who made the critical mistake." *Id.* at 1369. I would hold that here, as in *Ortiz*, the officer's "conduct was 'sufficient to establish objectively reasonable behavior.' " *Id.* at 1371 (quoting *United States v. Freitas*, 856 F.2d 1425, 1431 (9th Cir. 1988)).

Moreover, the majority's opinion appears to extend unnecessarily the guiding Supreme Court opinions. In *Malley*, the Court stated that the question was "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." 475 U.S. 345. In *Groh*, the Court denied qualified immunity because the warrant "did not describe the items to be seized *at all*" and "was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." 540 U.S. at 558. Here, there is really no question that there was probable cause to issue the warrant and that it was not facially invalid.

I recognize that each provision of a search warrant should be supported by probable cause. *See In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991) (stating that "probable cause must exist to seize all the items of a particular type described in the warrant"). Nonetheless, we have held in appeals from suppression orders that evidence from valid portions of a warrant may be severed from invalid portions.[20] Similarly, we should recognize that

---

[20] In *SDI Future Health*, we "endorsed a doctrine of severance," noting that we had "previously allowed severance when a warrant lacked particularity because of some unduly broad language in the warrant." 568 F.3d at 707 (internal citation omitted). We commented that we do not allow severance where "the valid portion of the warrant is 'a relatively insignificant part' of an otherwise invalid search." *Id.* (quoting *Kow*, 58 F.3d at 428). Here, the focus of the search was for Bowen and his sawed-off shotgun. It seems doubtful that had he or the shotgun been found, that evidence would have been suppressed because of the overbreadth of the warrant.

the lack of probable cause for one clause in an otherwise valid warrant does not mean that the officer's decision to seek the warrant, or even to include that clause in the warrant, was necessarily unreasonable.[21] Instead, at least where the warrant is supported by probable cause and is facially valid, but there is some question as to the sufficiency of evidence to support a section of the warrant, then absent some showing of bad faith on the part of the officer or of a failure to present all the relevant known facts to the magistrate (*see Leon*, 468 U.S. at 923), the officer should be allowed to rely on his superiors, the district attorney and the magistrate to correct any over-breadth. Certainly, that should be the case here, as the officer's affidavit clearly sets forth the basis on which the officer mistakenly thought he could seek a warrant to search for indicia of gang membership.

Moreover, the two provisions of the warrant at issue — those authorizing searches for firearms and for indicia of gang membership — do not appear to have been very important either when the warrant was initially sought or later. First, as noted, the primary purpose of the search was to arrest Bowen. Second, because the district court upheld the warrant's provision allowing the search for, and seizure of, indicia of home ownership, and because the majority concedes that the officers were entitled to search for disassembled parts of the sawed-off shotgun, the questioned provisions did not expand the actual scope of the search. Third, as the search only resulted in the seizure of Mrs. Millender's shotgun and a box of ammunition (and no indicia of gang membership), it does not appear that plaintiffs were really harmed by the search authorized by the questioned provisions of the warrant (as contrasted to the entry into the home and the general search). As Justice Kennedy noted in his dissent in *Groh*, the Supreme

---

[21]Of course, the operating premise remains that there was no probable cause to support the particular section of the warrant. What is at issue is only the second prong for qualified immunity, whether the officer, in good faith, could have relied on the magistrate.

Court has stressed that " 'the purpose of encouraging recourse to the warrant procedure' can be served best by rejecting overly technical standards when courts review warrants." 540 U.S. at 571 (quoting *Gates*, 462 U.S. at 237). Here, even accepting that there was no probable cause to support the questioned provisions of the warrant, because this defect did not expand the scope of the search nor cause any real harm to the plaintiffs, it should not defeat an otherwise appropriate grant of qualified immunity.

This conclusion is reinforced by the purpose of qualified immunity: to "amply" protect officers other than "the plainly incompetent or those who knowingly violate the law." *KRL II*, 512 F.3d at 1189 (quoting *Malley*, 475 U.S. at 341). Here, as noted, there is no suggestion that the officer "knowingly violated the law." While the majority concludes that the officer should have known that the search warrant was too broad, the length it has to go to make that point suggests that an officer's failure to so reason cannot be considered plain incompetence. Indeed, the very fact that judges on this en banc panel disagree on this point, in itself, weighs in favor of granting qualified immunity.

## IV

Last, but not least, I am concerned that the majority's parsing of the search warrant will lead to uncertainty and needless litigation. Denying qualified immunity where, as here, the defect in the warrant (a lack of probable cause for two sections of a warrant) did not expand the scope beyond what was constitutional and did not cause any real harm, creates considerable incentive to challenge all but the narrowest of warrants. Even if the overbreadth of a warrant does not produce any evidence and does not result in any real harm, a disgruntled person can overcome a claim of qualified immunity by showing that the officer did not have probable cause to support some part of the warrant. This seems contrary to the purpose of qualified immunity. *See Malley*, 475 U.S. at 141.

Moreover, the approach may well interfere with a police officer's ability to properly protect the public and investigate crimes. Instead of investigating a possible relationship between an assault with a deadly weapon by a convicted gang member and the felon's street gang, the majority would hold the officer personally liable for not grasping that these facts did not support the issuance of a warrant for anything other than the felon and the particular weapon. This appears to be the type of "high level of generality" that Justice Thomas warned against in his dissent in *Groh*, 540 U.S. at 578. Furthermore, this approach may well discourage officers from following up on leads that they would otherwise bring to the attention of their superiors for fear of personal liability if they unwittingly err in their judgment.

\*

To recap, although I think that the officer could reasonably have sought to search for firearms other than the shotgun, I agree with the majority that there was not a sufficient showing of a relationship between the assault and gang membership to provide probable cause for the inclusion of indicia of gang membership in the search warrant. But, applying the factors stressed by the Supreme Court and our court, I cannot conclude that the officer's inclusion of the provision in the warrant was so objectively unreasonable as to preclude reliance on the approval of his supervisors, the district attorney and the magistrate. It was reasonable for the officer to apply for the warrant, there was probable cause to issue the warrant, the warrant was not facially invalid, the warrant properly identified the limited matters to be seized, and the officer followed the proper procedures for seeking review by his superiors, a district attorney and a magistrate. Moreover, at least as to the questioned provisions, it does not appear that the officer hid any relevant information from his superiors or the magistrate and his affidavit plainly presented the grounds on which he sought indicia of gang membership. Furthermore, I have found no precedent that suggests that an officer may not rely

on his superiors and the magistrate when he makes an honest mistake in thinking that there is probable cause to support a provision in an otherwise valid warrant. The majority's contrary conclusion is of little real benefit to the plaintiffs, and unfairly punishes a line officer for what, at most, was a failure on the part of his superiors, the deputy district attorney and the magistrate, to properly limit the warrant.[22] Here, as in *Ortiz*, an "error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers who made the critical mistake." 887 F.2d at 1369. I would hold that the officer's application for a search warrant which included searching for other firearms and indicia of gang membership was not objectively unreasonable and that the officer is entitled to qualified immunity.

---

SILVERMAN, Circuit Judge, with whom TALLMAN, Circuit Judge, joins, dissenting:

I join Parts II through IV of Judge Callahan's dissent, but write separately to emphasize several points.

The doctrine of qualified immunity "protects government officials from liability for good faith misjudgments and mis-

---

[22]There is some irony in judges, who enjoy judicial immunity, holding that a line police officer may be personally liable for the breadth of a warrant when the system as set forth by the Supreme Court depends on the "detached scrutiny of a neutral magistrate" (*Leon*, 468 U.S. at 913), and the magistrate failed to properly perform his or her duty. The officer's mistake was clear from his affidavit. He thought that the facts that Bowen had committed an assault with a deadly weapon, and was a felon and a gang member were sufficient to allow for the search of indicia of gang membership. There is no suggestion that the officer hid anything from his superiors, the district attorney, or the magistrate. However, as the magistrate has judicial immunity, blame cascades down on the line officer. As Gilbert & Sullivan noted in *The Pirates of Penzance*: "a policeman's lot is not a happy one."

takes," and that is precisely the situation here. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). The judge issued a defective warrant and the deputies mistakenly relied on it, but their mistake was entirely in good faith. The deputies did not act *until* they obtained the warrant and they did only what the warrant authorized them to do. They did not engage in any form of misconduct. They did not rough-up the residents. They did not put false information in the affidavit, conceal exculpatory information, or seize property not mentioned in the four-corners of the warrant. This is not a case where police officers sought to evade the warrant requirement; to the contrary, they sought to comply with it. The record is totally devoid of any evidence that the deputies acted other than in good faith.

Qualified immunity protects from liability "all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Does the deputies' mistake rise to the level of plain incompetence or intentional violation of the law? I cannot imagine a clearer case of reasonable error than this one. In determining whether the deputies reasonably relied on the warrant, "all of the circumstances . . . may be considered." *United States v. Leon*, 468 U.S. 897, 923 n.23 (1984). It is undisputed that the deputies knew Bowen to be a convicted felon with a very violent history, including convictions for assault with a deadly weapon and being a felon in possession of a firearm. They also knew that he reportedly had just shot at the victim several times with a short-barrel shotgun. As a convicted felon, Bowen was prohibited from possessing firearms. Under such circumstances, how can it be "entirely unreasonable" — not just a mistake but *entirely unreasonable* — for the deputies to have relied on a judge-signed warrant authorizing the seizure of all of Bowen's guns? *See Ortiz v. Van Auken*, 887 F.2d 1366, 1370 (9th Cir. 1989).

I also do not see how the deputies can be deemed to be plainly incompetent, or to have knowingly violated the law,

for relying on the warrant's authorization to seize Mona Park Crip gang paraphernalia. The deputies had probable cause to believe both that Bowen was tied to the Mona Park Crip gang and that he was residing at the Millender residence. Had Mona Park Crip paraphernalia been found in close proximity to guns during the search of the Millender house — say, a gun concealed in Mona Park Crip clothing — such a discovery would have tended to prove that the guns were Bowen's and not the Millenders'. It is commonplace for search warrants to authorize the seizure of items that can help identify persons in control of the premises or contraband. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1229 (9th Cir. 2009). The deputies' belief in the validity of this portion of the warrant was entirely reasonable.

Qualified immunity insulates police officers from the threat of personal liability so that they can "execute [their] office with the decisiveness and the judgment required by the public good." *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974). The tradeoff for this perceived societal benefit is that some wrongs will go uncompensated. That is the nature of immunity, and it is a tradeoff adopted by the Supreme Court itself.